UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **WASHINGTON MUTUAL BANK**, | ) | Case No. 1:07 CV 683 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | (Resolving ECF #34, 36) |
| **PATRICIA CHIAPPETTA, et al.,** | ) | |
| | ) | |
| Defendants. | ) | Magistrate Judge James S. Gallas |
| | ) | |

This matter is before the court under diversity jurisdiction. On March 8, 2007, plaintiff,

Washington Mutual Bank ("WaMu"), filed its complaint in foreclosure[1] alleging that a promissory

note and mortgage executed by John and Patricia Chiappetta in connection with the note were in

default, and that it was entitled to judgment in the amount of $431,568.53 plus interest at the rate

of 7.65% from October 1, 2006 plus costs incurred for the protection of the premises under Ohio

Rev. Code §5301.233.[2] WaMu now, moves for partial summary judgment on the issue of its priority

against the liens of Infinity Construction Co., Inc. ("Infinity") and the State of Ohio, Department of

Transportation ("ODOT").  Defendant Infinity cross-motions for summary judgment on the issue

of its priority under its cross-claim.

*Summary Judgment Standard:*

Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary

judgment is only proper when there is no genuine issue of material fact and the moving party is

---

[1] "'Foreclosure' may be defined as '[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property.' Black's Law Dictionary (8 Ed.2004) 674." *Downey v. 610 Morrison Road, L.L.C.,* 2008 WL 2751214, 3, 2008-Ohio-3524 (Ohio App. 10 Dist.).

[2] According to the title company's preliminary judicial report, in 2007 the Chiappettas' property had a fair market valuation for state property tax purposes of only $126,850.00 (See Ex. C to Complaint, ECF # 1).

1:07 CV 0683                                        2

entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material

fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to

discovery requests, and depositions must be viewed in the light most favorable to the party opposing

the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d

176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986).  The court may not make credibility determinations or weigh the evidence when ruling on

a motion for summary judgment.  *Anderson*, 477 U.S. at 255.  The burden is upon the movant to

demonstrate the absence of a genuine issue of material fact.  *Adickes v. S. H. Kress & Co.*, 398 U.S.

144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979),

*cert. dismissed* 444 U.S. 986 (1979).  However, the nonmoving party is obliged to produce some

evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial.

*Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The

nonmoving party must produce significant probative evidence in support of the complaint to defeat

the motion for summary judgment through affidavits or admissions on file.  *Moore v. Phillip Morris*

*Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  In the final analysis, "the threshold inquiry . . . [is]

whether there is a need for trial -- whether in other words, there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party."  *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340.  Once the nonmoving party has

1:07 CV 0683                                    3

responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah*

*v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

*Uncontested Facts:*

1. John Chiappetta and Patricia Chiappetta are owners of the real property located at 25608 Chardon Road, Richmond Heights, Ohio 44143, as more fully described in the complaint.

2. A prior first mortgage was executed by the Chiappettas in favor of  FirstMerit Mortgage Corp. ("FirstMerit"), recorded on January 12, *1998* in Cuyahoga County Official Records Book 98-260, Page 30 .

3. A prior second  mortgage was executed by the Chiappetta in favor of  FirstMerit Bank N.A. and recorded on April 4, *2000* in Cuyahoga County Official Records Instrument No. 20004040079.

4. A Certificate of Judgment in favor of Infinity Construction Co. Inc. against John Chiappetta in the amount of $146,000.00 was filed on September 9, *2002* at Certificate of Judgment JL-02-175834, Clerk of Courts, Cuyahoga County, Ohio.

5. A Certificate of Judgment in favor of Director of Transportation of The State of Ohio (ODOT) against John Chiappetta in the amount of $541,417.19 was filed on March 16, *2004* at Certificate of Judgment JL-04-216081, Clerk of Courts, Cuyahoga County, Ohio.

6. Washington Mutual Bank, as successor-in-interest to Long Beach Mortgage Company by operation of law, is the holder of a mortgage recorded on June 9, *2005* as Instrument No. 200506090788 of the Cuyahoga County Recorder's records.

7. Long Beach Mortgage loan proceeds in the amount of $133,680.46 were used to pay off a prior first mortgage held by FirstMerit Mortgage Corp. ("FirstMerit"), recorded on January 12, 1998 in Cuyahoga County Official Records Book 98-260, Page 30.

8. Long Beach Mortgage loan proceeds in the amount of $153,227.59 paid off a prior second mortgage held by FirstMerit Bank N.A. recorded on April 4, 2000 in Cuyahoga County Official Records Instrument No. 20004040079.

*State Law Governance:*

        This foreclosure action is in federal court as a matter of diversity jurisdiction and there is no

dispute that the laws of the State of Ohio govern its disposition. Under the *Erie*-doctrine, [*Erie R.R.*

1:07 CV 0683                                            4

*v. Tompkins*, 304 U.S. 64 (1938), in diversity cases the federal courts apply state law " in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir.2001); *J P Morgan Chase Bank, N.A. v. Winget* 510 F.3d 577, 582 (6th Cir.2007).


Under state law, the general state rule is that  mortgage and lien priority is governed  by the date of filing with the county recorder. See Ohio Rev. Code §5301.23; *Alegis Group L.P. v. Lerner*, 2004 WL 2647607 at *2, 2004-Ohio- 6205 (Ohio App. 5 Dist.). WaMu contends, however, that under equitable subrogation it holds a first lien position on the premises to the extent it paid First Merit on the original first and junior mortgages for the  total amount of $287,088.05 ($133,860.46 paid to satisfy the prior first mortgage recorded in 1998 and $ 153,227.59 paid to satisfy the second mortgage recorded in 2000) (See Uncontested facts #7-8).


*Conventional subrogation*:

State courts have a long history of governance over such claims under principles of conventional subrogation, where there was an express or implied contractual covenant that the refinanced mortgage would constitute the first lien.  *E.g. Straman v. Rechtine*, 58 Ohio St. 443, 51 N.E. 44 (1898)(express contractual agreement with property owner); *Federal Union Life Ins. Co., v. Deitsch*. 127 Ohio St.505, 189 N.E. 440 (1934)(same); *Miller v. Scott*, 23 Ohio App. 50, 154 N.E. 358 (1924)(although there was no express agreement within the mortgage for substitution it was

1:07 CV 0683                                          5

implied from the parties' negotiations).[3]  The age-worn rationale from *Straman* to subrogate and thus

preserve  lien priority has not lost any of its logic and remains *apropos*:

> As the lien of the creditors of Anton Rechtine attached to the lands immediately upon
> his death, and as the lien of Mr. Brunning's mortgage attached long after the death
> of Anton Rechtine, the proceeds of the sale of the lands would have to be applied to
> the payment of general creditors, and Mr. Brunning would get only such surplus as
> might be coming to Ferdinand after the settlement of the estate of his father. This
> would be compelling Mr. Brunning to contribute $1,600 of his own money, without
> consideration, for the benefit of the general creditors of Anton Rechtine. This would
> be wrong, and should be avoided if it can be done without injuring the legal rights
> of others. As matters stood after the death of Anton Rechtine, and up to the payment
> of the insurance company's mortgage with the money of Mr. Brunning, the creditors
> were legally entitled to receive only the surplus after payment of the insurance
> mortgage. They contributed nothing towards paying that mortgage, and they are not
> entitled to be benefitted by the payment made with the money supplied by Mr.
> Brunning for that purpose. To subrogate him to the lien of the[original] insurance
> mortgage before its release, and to set aside that release, and restore its full force for
> his benefit, will protect him from loss, and will not put the general creditors into a
> worse condition than they were before Mr. Brunning loaned his money. Such
> subrogation will add no new burdens to the creditors. When their liens on the lands
> accrued, the lands were bound for the payment of the mortgage lien of $1,600, and
> it can make no difference to the creditors whether payment is made to the [original
> mortgage holder] insurance company or to Mr. Brunning.

*Straman*, 58 Ohio St. at 454-455, 51 N.E. at 45 - 46.


In *Straman*, the  lien arose by operation of law, so it was not of record,  and Mr Brunning

had negotiated with the known encumbrance holder to accept a junior position prior to refinancing

the mortgage. See *Straman v. Rechtine* , 58 Ohio St. 443, 458, 51 N.E. 44, 47 (1898). Thus equity

favored  carrying out the intention that the refinanced mortgage was to be the first and best lien.

Here in contrast there is no argument of  negotiated  priority or even that the mortgage document

---

[3] Conventional subrogation requires," express or implied mention of appellant's obtaining the priority of the
claims discharged." *Jones*, 61 Ohio St. 2d at 101.

1:07 CV 0683                                  6

constituted "conventional subrogation."  WaMu argues only for equitable subrogation and unjust

enrichment As shall be explained, WaMu is entitled to equitable subrogation.


*Equitable subrogation*:

Wamu's legal foundation for its argument differs since WaMu maintains that it is entitled

to a first and second lien positions based on equitable, not conventional subrogation because it

presumed that the title company would settle all intervening liens:

World Class Title Agency of Ohio, LLC ("World Class"), the title company that
closed the loan from Washington Mutual to the Chiappettas prepared a Commitment in
anticipation of the closing which disclosed the various prior liens that were to be released
or paid from the loan funds. (See Exhibit C). World Class requested the payoff amount
on the borrower's behalf from FirstMerit as the holder of the first and second mortgages
prior to the closing. Title companies are responsible for obtaining releases or
subordinations of any liens that appear on the Commitment – without input by the lender
other than the provided closing instructions (See Exhibit A). As Exhibit A indicates and
mortgage loan closing practices in the State of Ohio dictate, it is the common function of
the lender to take the application and provide closing instructions to the title company, an
agent of the borrower. The title company then must ensure that prior liens are paid or
releases are obtained in conformity with the closing instructions. To require a lender to
ensure prior liens are paid and/or releases are obtained would usurp the traditional and
long standing role of the title company and impose an unreasonable duty on a Bank. It is
important to note that the **Real Estate Settlement Procedures Act of 1974**; 12 USC
2608, requires that for a federally regulated mortgage loan, a party referring a borrower to
a title company may not require that the borrower use that particular title company. It is
clear that a title company is working for the borrower to close a loan - in accordance with
the Lender's instructions. Any actions of the title company therefore cannot be imputed
to the innocent Lender.


It was the Lender's and the Chiappettas' intention for Washington Mutual to have
a first mortgage on the subject property. The Lender would never have originated the
mortgage loan subject to the instant action if it were not to have a first mortgage
encumbering the legal interest of the Chiappettas in the property, or if it were aware of
any prior liens that would not be released or subordinated by the title company. Again, a
title agency is paid by the borrower for such services.

1:07 CV 0683                                        7

(WaMu's Brief p.4).


The title search report from World Class made no mention of the two interceding judgement liens. If the liens from Infinity and ODOT had been acknowledged, it would have been impossible to carry out WaMu's intent to take a first mortgage after satisfying the Chiappettas debts.  Infinity's and ODOT's liens alone totaled  in excess of $687,000.00, which was well above the loan proceeds of $436,500.00.


WaMu's Exhibit "B" discloses that after satisfying  prior mortgage balances, $41,180.00 of the funds were disbursed to pay unsecured creditors. (See ECF # 34-3). On the mortgage document itself, under paragraph number 4, the covenant concerning "Charges; Liens," there is the interlineated handwritten note "To the best of our knowledge any/and all liens have been subordinated to the First Mortgage," followed by the Chiappettas' initials.


The Ohio Supreme Court has recognized equitable subrogation as an alternative to "conventional subrogation" and  stated that legal or equitable " subrogation, as distinguished from conventional subrogation, ' * * * arises by operation of law when one having a liability or right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid.'" *State, Dept. of Taxation v. Jones,* 61 Ohio St.2d 99, 102, 399 N.E.2d 1215, 1217 (1980), quoting *Federal Union*

1:07 CV 0683                                              8

*Life Ins. Co. v. Deitsch*, 127 Ohio St. at 510, 189 N.E. at 442-43.  However, the Ohio Supreme Court

did not set out any general rule, but only instructed that its application was case specific:

> We choose first to remark that equity in the granting of relief by subrogation is
> largely concerned with and rests its interference, when called upon, on the prevention
> of frauds and relief against mistakes, and it is correctly stated that the right to it
> depends upon the facts and circumstances of each particular case. * * *

*Jones,* 61 Ohio St.2d at 102, 399 N.E.2d at 1217- 1218, quoting  *Canton Morris Plan Bank v. Most*,

44 Ohio App. 180, 184, 184 N.E. 765, 766 (1932). WaMu stands in the same position as Long Beach

would have as "the [mortgage] assignee takes only the interest which his assignor had in the

instrument-acquires but an equity, and, upon long-established doctrine in courts of equity, is bound

to submit to the assertion of the prior equitable rights of third persons." *Baily v Smith*, 14 Ohio St.

396, 413, 1863 WL 30, 34 Am. Dec. 385 (1863); and see *Canton Morris Plan Bank v. Most,*  44

Ohio App. 180, 184, 184 N.E. 765, 766 (1932).


          In *Jone*s, legal subrogation was denied because the mortgage company "imprudently"

cancelled its own first mortgage without first having received any title guarantee from the title

insurer, and  delayed filing the refinanced mortgage by three months until after the state had filed

its tax lien. *Id*., 61 Ohio St. at 103. In the state supreme court's view these constituted "a series of

improvident business maneuvers" and to allow subrogation "would encourage carelessness in taking

such securities.***" *Id.*, 61 Ohio St. 2d at 103-104.  The key factor was the mortgagee's control. The

state supreme court emphasized that the mortgagee, "was in complete control of the refinancing

application, and yet, the state, without acting fraudulently was able to secure priority of it claim .

. . ." *Jones*, 61 Ohio St. 2d at 103, 399 N.E.2d at 1218. The second factor was notice.  The lender

was criticized  for failing to make further inquiry for additional liens when it was aware of a federal

1:07 CV 0683                                    9

tax lien and two liens for services of a C.P.A. The lender was burdened with more than actual knowledge. It was burdened with the responsibility to respond to reasonable notice. Therefore, the state supreme court instructs its lower courts to weigh control and notice.


*WaMu's Control and Notice:*

Equitable subrogation exists to alleviate inequities due to fraud and mistake and WaMu claims mistake in the title search. See *Canton Morris Plan Bank v. Most*, 44 Ohio App. 180, 184, 184 N.E. 765, 766 (1932)("equity in the granting of relief by subrogation is largely concerned with and rests its interference, when called upon, on the prevention of frauds and relief against mistakes. . . "). However, *Jones*, is not on point here since there was no mistake in the title search. *Jones* explained the doctrine of equitable subrogation in the context of an intervening judgment lien filed between the execution of the refinanced mortgage and filing of this mortgage 3 months later. See *Jones,* 61 Ohio St.2d at 99-100, 399 N.E.2d at 1216. Under those circumstances the state supreme court had no difficulty finding the mortgagee at fault and not entitled to equitable subrogation. Those circumstances did not occur in the matter at hand, so this court is left to decide the issues of control and notice without specific guidance from the state supreme court.


When, as in this instance, the state's highest court has not decided the issue, the federal court must ascertain the state law from "all relevant data." *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995) quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985); and see  *Rousey v. U.S.*, 115 F.3d 394, 397 (6th Cir. 1997); *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 698 (6th Cir. 2006).  All relevant data includes the

1:07 CV 0683                                          10

state's intermediate court decisions, restatements of law, law review commentaries and decisions

from other jurisdictions on  the "majority" rule.  *Rousey*, 115 F.3d at 397; *American and Foreign*

*Ins. Co. v. Bolt*, 106 F.3d 155, 158 (6th Cir. 1997).


Three recent intermediate state court cases, which WaMu should be familiar, *Washington*

*Mutual Bank v. Hopkins*, 2007 WL 4532679, 2007-Ohio-7008 (Ohio App. 10 Dist.), *Washington*

*Mutual Bank, F.A. v. Aultman*, 172 Ohio App. 3d 584, 876 N.E. 2d 617, 2007-Ohio-3706, *motion*

*to certify allowed*, 115 Ohio St.3d 1471, 2007-Ohio-5735, *cause dismissed,* 116 Ohio St. 3d 1419,

2007- Ohio-6378 (Table), and  *Washington Mut. Bank v. Loveland,*  2005 WL 737403, 2005-Ohio-

1542 (Ohio App. 10 Dist.) all involved post- refinancing lienholder discovery, and WaMu prevailed

in two of these three. [4]


*Loveland* is easily distinguishable since the mortgagee had *actual* knowledge of a prior

home equity line of credit (an "open-ended mortgage" as set out under Ohio Rev. Code §5301.232),

which was mistakenly thought to have been closed after the mortgagee refinanced its outstanding

balance. See also *Bank of New York v. Fifth Third Bank of Central Ohio*  2002 WL 121925, 2002-

Ohio-352 (Ohio App. 5 Dist.).  Both decisions found the lenders were in the best position to secure

their interests and assure that the prior lines of credit were actually closed, therefore, no equitable

subrogation.

---

[4] Infinity insinuates that the subsequent settlement and dismissal of *Aultman* from the Ohio Supreme Court's
docket was a deliberate effort by WaMu to prevent the Ohio Supreme Court from formulating a general rule adverse to
WaMu's present legal contentions.

1:07 CV 0683                                              11

*Hopkins* involved negligence by WaMu's title agent in failing to discover a junior home equity line of credit. *Id.*, 2007 WL 4532679 at ¶ 20. The decision relied in part on *Restatement 3rd of Property: Mortgages* §7.6 and concluded equitable subrogation should apply because the junior line of credit stood in the same position as it did before refinancing. *Aultman* examined the mortgage terms to find, contrary to appellee, the original mortgage did not state that it was subject to all encumbrances of record, and it read state intermediate cases to create a general rule that when the refinancing mortgagee acts in conformity with ordinary and reasonable practices to establish its priority then equitable subrogation applies. *Id.*, 172 Ohio App. 3d at 592-594, 876 N.E.2d at 624-625. Equitable subrogation was enforced because:

> Washington Mutual's failure to achieve first-lien position was due solely to the title agent's inadvertent failure to discover Caldwell's preexisting mortgage. Washington Mutual's negligence was a "mere mistake," and its failure to obtain first-lien position was not due to the bank's failure to follow ordinary business practices to protect its interests. The application of equitable subrogation in this instance comports with the doctrine's purpose of providing relief from mistakes.
>
> Moreover, Caldwell's position would not change as a result of subrogation. Caldwell was originally in the second-lien position[.]

*Id.*, 172 Ohio App.3d at 594, 876 N.E.2d at 625.

*Aultman* distinguished *Chase Manhattan Bank v. Westin*, 2003 WL 22227394, 2003-Ohio-5112 (Ohio App. 12 Dist), and *Loveland*,  See  *Aultman*,  172 Ohio App.3d at 593, 876 N.E.2d at 625.  *Chase Manhattan Bank v. Westin*, like *Loveland*, again involved actual knowledge of other encumbrances, so it is easily distinguishable. [5] *Aultman* found unpersuasive *Leppo, Inc. v Kiefer*,

_____

[5] *Chase Manhattan Bank* involved a mistaken legal assumption as opposed to factual error, the title agent that Chase would receive the same lien priority position as held by the mortgage lien for loan #3. *Id.*, at ¶ 10.  The decision found that Chase should have protected its interests and reasonable business practice would have been for the mortgage

1:07 CV 0683                                   12

2001 WL 81262 (Ohio App. 9 Dist.), and *Associates Financial Services Corp. v. Miller,* 2002 WL
519667, 2002-Ohio-1610 (Ohio App. 11 Dist.).


      *Leppo, Inc.* and *Associates Financial Services Corp.* are factually similar to *Aultman* and
*Hopkins,* but came to the opposite conclusion. *Leppo, Inc.*, found "culpable negligence" due to the
title agent's failure to discover two liens and the refinancing mortgagee's failure to protect its
interests under similar circumstances to those in *Aultman* and *Hopkins*. The decision determined that
the title company was the lender's agent, and that the lender had constructive knowledge of all
judgment liens duly recorded. *Id.*, 2001 WL 81262 at * 2. Similarly, in *Associates Financial
Services Corp.*, equitable subrogation was denied, "when appellant's agent conducted the title search,
it failed to discover appellee's preexisting mortgage . . . appellant was in complete control of the loan
process, and there is no allegation that appellee acted fraudulently or otherwise tried to conceal its
properly recorded mortgage from appellant." *Id.*, 2002 WL 519667 at * 3. In comparison the "mere
mistakes" in the title searches nullified equitable subrogation.


      Also there are *Alegis Group L.P. v. Lerner,* 2004 WL 2647607, 2004-Ohio-6205 (Ohio
App. 5 Dist.), and *IndyMac Bank, FSB v. Bridges,* 169 Ohio App.3d 389, 391, 863 N.E.2d 185, 186
(Ohio App. 10 Dist.,2006), which in this court's view are not illustrative of state law generally.
*Alegis Group* curiously departed from *Jones* and substituted a four-part test for equitable estoppel,
treating this as an equivalent to equitable subrogation. *Id.,* at ¶ 12. *IndyMac Bank,* adhered to the

---

document to expressly state the parties' intent to subordinate the intervening mortgages in order for conventional
subrogation to apply. The state court suggested language as that the mortgagee was required to be the first mortgage
lienholder as a result of the refinancing and require the mortgagees to ensure that the mortgage was "the first and best
lienholder." *Id.*, at ¶ 11.

1:07 CV 0683                                      13

position from *Associates Financial Services Corp., (Id.,* at ¶¶ 19-20),  but it involved a special circumstance of a "due on sale" clause in the undiscovered mortgage. Prejudice was not due to realignment of its interest in foreclosure, but due to the prior sale of the property and  failure to pay the junior lienholder at the time of sale (when funds would have been available to satisfy the junior lien).

The intermediate state court decisions acknowledge negligent title search  as "mistake." See *Leppo, Inc.,* 2001 WL 81262 at * 2 (culpable negligence);  *Alegis Group L.P.,* 2004 WL 2647607, at *3; *Associates Financial Services Corp.*, 2002 WL 519667, at * 3; *IndyMac Bank, FSB,* 169 Ohio App.3d at 395, 863 N.E.2d at 189;  *Washington Mut. Bank v. Hopkins* 2007 WL 4532679, at * 5; *Washington Mut. Bank, FA v. Aultman,* 172 Ohio App.3d at 594, 876 N.E.2d at 625. The dividing line is whether the mistake in the title search is attributed to the lender as it was in *Alegis Group*, *Associates Financial Services Corp.*, *IndyMac Bank*  and *Leppo, Inc*.  In *Hopkins* and *Aultman* the degree of control did not appear to matter since the lender was not tainted by the title agent's "mere mistake."

*Aultman* and *Hopkins* downplayed the importance of the lender's control in weighing control and notice.  The reasoning of these decisions is inconsistent with the state supreme court's rationale in *Jones* for this reason. In *Jones*, the state supreme court found that the lender had control over all aspects of the refinancing.  The better view, as expressed in other intermediate state court decisions, is to place more importance on the degree of control the lender exerts over the title agent.

1:07 CV 0683                                        14

The degree of control, though, cannot simply be presumed in order to create a principal-agent

relationship between the lender and the title company. As discussed in *Creative Hardwood Floors,*

*Inc. v. Schafer* :

> The relationship of principal and agent exists only when one party exercises the right
> of control over the actions of another, and those actions are directed toward an
> attainment of an objective which the principal seeks. *Mayfield v. Boy Scouts of
> America* (1994), 95 Ohio App.3d 655, 660, 643 N.E.2d 565, citing *Hanson v. Kynast*
> (1986), 24 Ohio St.3d 171, 173, 494 N.E.2d 1091. The basic test is whether the
> principal has the right of control over the manner and means of the work being done.
> *Duke v. Sanymetal Products Company* (1972), 31 Ohio App.2d 78, 82, 286 N.E.2d
> 324.
>                                          . . .
> As noted above, the basic test is whether the employer has the right of control over
> the manner and means of the work being done. BOMC [Banc One Mortgage Corp.]
> had no control over the means and manner of the work being done by Title First.
> Title First is an independent title company, which performs closings for various
> institutions. BOMC had a contract with Title First, but had no control over how Title
> First carried out the functions under that contract. Title First carried out its functions
> at closing and during the disbursement process internally, without any overriding
> control exercised by BOMC.

> *Id*., 1998 WL 515783, at *6- 7 (Ohio App. 5 Dist.).

Infinity does not dispute WaMu's claim that World Class Title was working for the borrower

to close a loan - in accordance with the lender's instructions. WaMu has stated that World Class

Title was not its agent. Infinity has not produced contrary factual evidence of WaMu's or Long

Beach's control over World Class Title. Accordingly, on the first factor of control, WaMu prevails

in demonstrating that it lacked control over the title company's actions in the refinancing.

1:07 CV 0683                                       15

The next factor is  notice.  *Canton Morris Plan Bank v. Most,* emphasized the importance

of notice under state law explaining:

> A careful reading of the *Amick* and *Straman* Cases, *supra*, convinces us, however,
> that our Supreme Court places considerable stress on the question of notice as it may
> affect the right to subrogation. It refers in these cases frequently to the necessity of
> 'notice' and 'lack of knowledge' in the party seeking relief, so that we believe that
> that court has in fact adopted and approved of the  further general rule found stated
> in 33 A. L. R. 157, that: 'Where an existing lien has been discharged by the holder
> and a renewal lien taken in ignorance of intervening lien against the property, the
> mortgagee will be regarded as acting under such a mistake of fact as to entitle him
> to relief by a restoration of his priority, if the rights of innocent parties are not
> involved.'

> *Id.*,  44 Ohio App. at 185, 184 N.E. at 766 - 767.

Citing *Canton Morris Plan Bank*,  *Zimpher v. Schwartz,*  held that a refinanced mortgage

taken with actual knowledge of an intervening mechanics lien did not obtain the priority of the

mortgage it replaced. *Id.*,  64 Ohio App. 7, 18, 27 N.E.2d 499, 504 (1940).[6]

*Leppo, Inc*., differs in that it  found notice through constructive knowledge of the intervening

liens. As discussed above, this rationale is not consistent with *Jones.* First, the notice of state tax lien

in *Jones* did not involve notice of a lien which was extant at the time of the title search.  Recall that

in *Jones*, the state tax lien arose after the title search. Second, *Jones* did not rely on imputed or

constructive knowledge. There was simply a lack of due diligence since the lender was on notice

due to its actual knowledge of a federal tax lien.

---

[6] *Zimpher* was found to represent state law and applied in *In re Braker (Hyde Park Lumber Co. v. West
Norwood Building & Loan Co.),* 127 F. 2d 652, 655 (6th Cir. 1942).

Similarly, *Eythe v. Commercial Bank & Savings Co.*, 40 Ohio App. 150, 153 178 N.E. 425, 426 (6th Dist.1930), found a mortgagee holds constructive knowledge of a judgement lien. However, that statement was not germane to the conclusion that the lender had priority over the judgment lienholder. *Id.* Rather this statement, as in *State ex rel. Collier v. Farley*, 2006 WL 2692573, ¶ 16, 2006-Ohio-4901 (Ohio App. 4 Dist.), goes to the validity of the judgment lien as such liens are creatures of statute and must be duly recorded- hence constructive knowledge must exist of their existence for their inclusion in foreclosure proceedings.

The issue of notice is more persuasively handled in *Wells Fargo Financial Leasing, Inc. v. Rinard,* 2008 WL 316088, 2008-Ohio-437 (Ohio App. 5 Dist.), which resolved the dispute between a prior lien holder and a mortgage refinanced by Ameriquest Mortgage Co.  MAF, Inc. held the original mortgage filed of record in 1997. The property owner subsequently entered into an unsecured credit agreement with Telmark, LLC, defaulted, and a certificate of judgment lien was recorded in May 2000.  In August 2003, the owner refinanced with Ameriquest and a portion of the loan proceeds were used to satisfy MAF's prior mortgage balance.  *Id.*, at ¶¶ 4-7. The owner had provided sufficient information in the loan application to put Ameriquest on notice of the intervening lien. Wells Fargo was assigned Telmark's judgment lien in 2005, commenced a foreclosure action, and was granted priority over Ameriquest's mortgage.  Ameriquest appealed and at issue was whether Ameriquest had constructive or actual knowledge of the Telmark lien. The trial court on remand affirmed on the basis of *actual* knowledge. *Id*., at ¶¶19-20.[7] *Wells Fargo Financial*

---

[7] For prior decision remanding the case to the trial court on the issue of knowledge see 2006 WL 3020321, 2006-Ohio-5544.

1:07 CV 0683                                        17

*Leasing, Inc.* held under state due diligence principles, constructive knowledge exists only of prior instruments in the chain of title, and a title search alone would not have uncovered the certificates of judgement. See *Wells Fargo Financial Leasing, Inc. v. Rinard,* 2008 WL 316088, 2008-Ohio-437 at ¶¶ 19-20. Ameriquest's argument for equitable subrogation was rejected because, "numerous Ohio courts have held the doctrine of equitable estoppel will not be use to benefit parties who were negligent in their business transactions, and who were obviously in the best position to protect their own interests." *Id.*, ¶ 22.

*Wells Fargo* extended this notice into actual knowledge because a record search would have easily uncovered the existence of the Telmark lien with certainty. Of course, *Jones* did not require actual knowledge, but only notice, and such certainly notice existed in the underlying facts in *Wells Fargo*. What is important is that the omission in the title search was not the foundation for notice, nor was there use of constructive knowledge from the existence of the recorded lien.

Although this "relevant data" consists of only a few intermediate decisions, it does evidence a compelling trend that "culpable negligence" arises when there is control and notice. The state cases may appear to be split on whether control plus mistake in the title search nullifies equitable subrogation. The standard is, however, whether the lender has acted in conformity with ordinary and reasonable business practices to establish its priority, and the lender's control must be included in making this assessment. WaMu has indisputably shown a lack of control over the title agency and Infinity has produced no facts to demonstrate that WaMu should have been on notice of the

1:07 CV 0683                                        18

existence of its and ODOT's intervening liens. Accordingly, WaMu's arguments on summary

judgment prevail.


*Unjust Enrichment:*

WaMu's fallback argument is that Infinity and ODOT will be unjustly enriched.  However,

state law does not appear to make a distinction between unjust enrichment and equitable

subrogation. Unjust enrichment under state law is part of the doctrine of equitable subrogation, not

a separate doctrine.

> Equitable subrogation has been described as a theory of unjust enrichment,
> preventing parties from receiving that to which they are not entitled. *Williams v. Erie
> Ins. Group* (1993), 86 Ohio App.3d 660, 665, 621 N.E.2d 770, 772-773. The right
> to equitable subrogation depends upon the facts and circumstances of each case, and
> the basis for the claim must be readily apparent. *Jones, supra*, 61 Ohio St.2d at 102,
> 15 O.O.3d at 133-134, 399 N.E.2d at 1217-1218.

*State Sav. Bank v. Gunther* , 127 Ohio App.3d 338, 346, 713 N.E.2d 7, 13 (Ohio App. 3

Dist.,1998).[8]

As Infinity argues the case *Firestone Tire & Rubber Co., v. Cent. Nat'l Bank of Cleveland*,

159 Ohio St. 423 (1953), is factually distinguishable. Further, the state courts have not applied

unjust enrichment to setting priority outside of the state's doctrine of equitable subrogation.

---

[8] The dissenting opinion in *Jones* made the connection very clear, "Equitable subrogation is applied in order
to prevent unjust enrichment." *Id.*,  61 Ohio St.2d at 105, 399 N.E.2d at 1219.

1:07 CV 0683                                        19

*Restatement 3rd of Property: Mortgages:*

When ascertaining state law, restatements of the law on the topic are another consideration. See *Rousey*, 115 F.3d at 397.  Ohio's Tenth District Court of Appeals did consider the Restatement of the Law 3rd, Property Mortgages (1997). See *Washington Mutual Bank v. Hopkins*, 2007 WL 4532679, at ¶ 22 (citing *Comment e* of §7.6 with  regard to the junior mortgage holder's prejudice argument).

Were this court to follow the basic principles outlined in that restatement section WaMu would prevail:

Subrogation

(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:

(1) in order to protect his or her interest;

(2) under a legal duty to do so;

(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not

1:07 CV 0683                                              20

> materially prejudice the holders of intervening interests in the real
> estate.

REST 3d PROP-MORT § 7.6

Subsection (b)(4) if applied would clearly carry out WaMu's desire for priority subrogation. However, this section of the restatement conflicts with state law. The Ohio Supreme Court's decision in *Jones* involved a refinancing with the same mortgagee. *Id.*, 61 Ohio St.2d at 99, 399 N.E.2d at 1216. *Comment e* of §7.6 explains that this situation is not "subrogation because "one cannot be subrogated to one's own previous mortgage," and instead this is a "replacement" as set forth under §7.3 of this restatement. Also under this comment, the restatement states its position that subrogation can be granted regardless of actual or constructive knowledge of intervening interests because that factor is irrelevant. That also conflicts with *Jones*' rationale based on constructive notice since "Appellant was made aware of the appellee's unusual debts in the accounting firm and also the Internal Revenue Service claim, but did nothing to inquire further as to any additional obligations." *Id.*, 61 Ohio St.2d at 103, 399 N.E.2d at 1218. As a result, the restatement's position on subrogation does not represent state law and cannot guide the decision on these motions.

## *CONCLUSION*

For the foregoing reasons Washington Mutual Bank's motion for partial summary judgment under Rule 56 of the Federal Procedure is granted (ECF #34) and Infinity Construction Co., Inc.'s motion for summary judgment on its cross-claim is denied (ECF # 36) with WaMu having first

1:07 CV 0683                                              21

priority to the proceeds of sale after the satisfaction of any outstanding real property tax lien on the

subject property located at 25608 Chardon Road, Richmond Heights, Ohio 44131, and that this

property be sold by way of foreclosure sale.


IT IS SO ORDERED.

                                    _____s/James S. Gallas_____
                                    United States Magistrate Judge


September 19, 2008